Good morning, Your Honors. Kyle Gray here representing Continental. And I'm going to refer to the parties as Continental, Northwest, and Northern, if that's okay. NWCFS just turns into way too many permutations. No, I appreciate that. I'm with you. Thank you. That will help. Okay. And I would like to reserve five minutes of my time for rebuttal. So, boy, more years back than I care to think of, when I was fresh out of law school, I clerked for a very experienced, very smart federal district court judge. And what he told me has stuck with me through my career, which is, when you're in federal court on diversity, most of the time, Erie will answer your question. The Erie Doctrine. And this case is about an Erie Doctrine, is an Erie Doctrine case that went south. The answer in this case all goes to the question of, does the temporary spacing unit that was created by the Montana Board in 2003 count for purposes of, was production done on pooled lands within the appropriate time period? Right. And so what we've got is, 2003, the spacing unit is created. Then the law under, Montana law has been clear for more years than matter, that under 8211-2001-B2 of the Montana Code Annotated, a temporary spacing unit remains in effect until and unless the board issues a contrary order, which didn't happen here, or a permanent spacing unit is established, which did happen here, but after the five-year time period for the lease. So the question is whether the temporary spacing unit constituted a pooling. Correct. Under the contract, under the language of the contract. And so the contract, the lease, and this is the odd case where it's not the lessor or the lessee that prepared the lease. It's the lessor. It was northwest. So what is essentially a bank or a credit unit prepared the lease for production of oil and gas on its property. It gave that lease to an entity called Diamond that's not involved here because Diamond eventually assigned that lease to my client, Continental. That lease says in it that pooling under the Habendum cause will extend the lease of the contract as long as there's production on the lease premises or lands pooled therewith. So I'm going to confess, you know, gross ignorance on oil and gas law. So when they create the temporary spacing unit, this only allows one well to be drilled within the quadrant. Is that correct? As I understand it, Your Honor, it's got to do with the curvature of the globe. And so what the board, the Montana Board of Oil and Gas Conservation, wants to do is to make sure there aren't areas that are captured incorrectly. And so, yes, they make it so you can only put one well on the temporary spacing unit. Now, so I'm trying to grasp exactly what pooling means. Pooling means what? That we've drawn from that if you sunk a well that you might be drawing from something else? Well, for purposes of this case, pooling is defined in the contract. And the contract defines pooling as including the creation of a spacing unit. So what does it mean outside of the contract world? I think you're probably right. But inside the contract itself, the four corners of the contract, it's a defined term. So outside in just oil and gas law, independent of this contract, so does pooling mean that you might have two wells in different spacing units that might be drawing from a common source? I think that's correct, Your Honor, that there's a pool of oil. There's different leases sitting over top of it and where the oil would come from. So you could have a potential that the oil itself pooled together. What provision of the lease are you relying on for the notion that it's a defined term? So that, Your Honor, is paragraph 16B in the contract, addresses pooling in states, notwithstanding anything to the contrary herein. No, I've read that 5,000 times. It doesn't define pooling. Is it 3E? You're correct. It doesn't define pooling. It says that it is pooled if you do the following and then 3E, that there's a spacing unit. Okay, so in 3E, where is pooling? I see where spacing unit is on there. So you have to look at 16B to see the habendum clause where it says, notwithstanding anything to the contrary, the portion of the land that in the event during the primary term, so that first five years, a portion or portions of the land covered by this lease are pooled either in accordance with paragraph 16A or by creation of a unit as defined in paragraph 3E. And temporary spacing units are included in paragraph? Temporary spacing unit, no. Spacing unit with neither temporary nor permanent in front of it is included in paragraph 3E. Right. But for a temporary spacing unit to affect a pooling, I thought there needed to be a voluntary agreement between the parties. No, Your Honor, that's not what the contract says. It doesn't say anything about it. That's what I'm getting at. That's a good point. That's why I thought you said there was some defined term that I missed, but it does not say that. That's exactly right. It is ambiguous on that point. No, I don't think it's ambiguous. I think there are you all in the industry, I think, know what that means to pool interests. And when you're dealing with temporary spacing units, my understanding was, again, that you needed a voluntary agreement between the parties for that to happen. That's one problem. But the other problem is just simply that even under the plain language, that 2003 temporary spacing unit certainly was not created during the primary term of the lease. Agreed, Your Honor. And the question becomes, does the contract require it to have been created during the five-year period? That's what it says. Well, so I guess I would just have to disagree. It doesn't say when it has to be created. It just says it has to have been in existence or be there during the five-year period, which it was. It's been there for a long time. It's been there. In particular, it's important that it was there when Northwest wrote up the contract. You know, as I read 3E, I mean, I'll just read it for a moment and I'll give you my construction and you can tell me why I'm wrong. Unit, 3E, shall mean a bounded area formed for the purpose of producing oil and gas, which may be described by the following terms, spacing unit, drilling unit, production unit, da-da-da-da-da. Well, there are two things going on here. It's a bounded area formed for the purpose of producing oil and gas, and then you can describe that bounded area by various things. So if, for example, the bounded area coincides with the spacing unit, you say, okay, we're pooling it with respect to this spacing unit. That's the bounded area. But the fact that you have a spacing unit doesn't mean that you have the bounded area for the purpose of producing oil and gas. You've got to have a separate contract that says, okay, here's the bounded area that we're using, that is to say that we're pooling. So the mere fact that you've got a spacing unit doesn't tell you that you've got a bounded area within the meaning of 3E. That's how I read that. How am I wrong? Well, again, I think that the sort of overarching problem with this contract is that it was put together by Northwest, given to another company, then that company assigned it to my client. And if you read this standalone, the contract, it starts out by saying, okay, well, the five years is expanded if you produce during the five years. And then the question is where you have to produce. Including in a pooled area. Right, including in a pooled area. And the only way your client's okay is that if it's in the pooled area because he was not drilling on the land. That's correct, Your Honor. Right. So that's the question here. Exactly. And so the contract itself says that in the event during the primary term, a portion or portions of the land covered by this lease are pooled either, in creation of a unit, and then you go down to 3E. Are pooled, you just added something. Say that again. Oh, are pooled either in accordance with paragraph 16A. Yeah. Okay, and that's, everybody agrees, no. Or by creation of a unit as defined in paragraph 3E. Right. And 3E defines a unit to mean, as Your Honor pointed out, a bonded area formed for the purpose of producing oil and gas. Right. That may include a spacing unit. Right, no, may be described as a spacing unit. May be described as a spacing unit. And the way I read that is, okay, we're agreeing to have a pooled unit, a bounded area, da-da-da, and here's how we describe the boundaries of that unit that we have just agreed to. It's that spacing unit that pre-exists, or it's that drilling unit or production unit. That is to say, a spacing unit by itself is not, without some agreement referring to it, is not a bounded area within the meaning of 3E. That's why I read 3E. How am I wrong? Well, I think that you probably can read it that way, but I think the other way you can read it is the way my client read it when they came into the contract having had nothing to do with how the contract was laid out. They looked at it and said, well, we're on a spacing unit. We are producing in this well. That's within the spacing unit, so we're fine. And now, could this have been written clearer? Absolutely, it could have been written clearer, but that's where things went wrong under the Erie Doctrine is because my client read the contract this way. He read it to mean if they went ahead with the well that was, everyone concedes it was pumped and it's producing, that that would extend this lease because as the habendum cause is written, it only requires there to be a spacing unit. Now, what else is the spacing unit for than for the production of gas? It's put in place by the Montana Oil and Gas Conservation Board. It's there to protect people in their understanding of what and how things are being produced until that spacing unit either is withdrawn by the board, which didn't happen here, or is made permanent, which did happen, but outside the time period. So that's how my client read this contract. Now, the court below read it to require certain other things, but I think everyone can agree that had Northwest said in there a permanent spacing unit or had put some other language in there that made it clear that the 2003 spacing unit wouldn't count for purposes of the habendum clause, we wouldn't be having this conversation, but that's how it wrote the contract. And the problem in the court below is that the district court decided to construe the contract in favor of the lessor because there is language to that effect in Montana law. No question about that. That is the law except, and this is where things went wrong, except that there is also longstanding law under Montana. It goes back to the first 1895 code that the Montana legislature adopted after statehood, which says that when you have a contract, if the party that created the problem is the one you construe against, if it's an ambiguity. And that's what we have here. Instead of construing the language that your honors have just pointed out and read through in favor of my client, which did not cause the problem, the district court construed it the other way. When you say caused the problem, do you mean the drafter or do you mean something else? Yes, the drafter. And the drafter is Northwest. There's no question about that. That's the normal construction, actually. You construe the document against the drafter. Right. Well, that's not only normal. It's required under Montana law under the Solberg case. So Montana has a weird exception to that doctrine for lessors of oil and gas land, which is odd. Yes, but we do not have an exception to that rule when it's the lessee or the lessor that has drafted the contract. And that's the Solberg case. Okay. And that's the case I would like to direct your honors' attention to. It's an old one. It's 1925, but it's right on point. And the Montana Supreme Court says it's settled law the terms of an oil and gas lease are to be construed most strongly against the lessee and in favor of the lessor. And then they go cite through a couple cases. And in cases of uncertainty, the language of the contract should be interpreted most strongly against the party who caused the uncertainty to exist. Cite to another section of the code, and then they say, These rules are more especially applicable to oil and gas leases as quite generally the contract is in form prepared by the lessee. And this is the case that's not the quite generally case. This is the case where the other side created the lease and easily could have made it clear that the 2003 spacing unit wouldn't count, but didn't do so. Okay. You're down to 36 seconds. Let's hear from the other side. Okay. But we'll make sure to give you enough chance to respond. Thank you, Your Honors. Good morning, Your Honors. My name is Brandon Hoskins, and I'm here on behalf of Northwest Farm Credit Services. I'll be trying to use about six, seven minutes because Northwest is only involved on the first issue, and I'll cede the rest of the time to Northern so they can discuss issue number two. Now, which one's one and two? I know which they are, but which ones, in your mind, which one's one and which one's two? Sure. So the only issue that affects Northwest in this case is whether or not the lease is held by production. What has been discussed for essentially everything right now. Okay. So that's what you're going to talk about. Okay. Correct, Your Honor. So one thing I want to address first is the idea of pooling versus the unit. And I think you guys have spoke about that quite a bit amongst counsel and the court. It's important that 16B and 3E are read together. And we're not just trying to define what a unit is. We're trying to define what a unit that would create a pooling is. And it has already been touched on that without a permanent spacing unit, you cannot have a forcible, a compulsory pooling, which is what was eventually obtained in this case. So just sort of back up or give me some context. If you have a permanent spacing unit, does that by itself create a pooling unit? It does not, but that is generally the process before the commission, is that you require, well, in all cases, you require a permanent spacing unit as a prerequisite to obtaining a pooling order. If you have a permanent spacing unit by itself, is that a pooling unit or is something more required? That is an additional determination by the court that you require a pooling order. But in every circumstance that I have seen in my experience, they come together, a permanent spacing unit and a pooling order. And 82-11-202. And who puts together the pooling unit? Is that done by the state? Is that done by parties who wish to drill? I mean, what kind of agreement and by whom? So in this case where you're forced pooling, the application is put together by an interested party, which is generally the operator, as in this case it's continental. And so that interested party has to give to the commission a breakdown of what the interests are, what the proposed spacing unit is, and has to meet certain prerequisites under the statutory and regulatory scheme that say that the resources will be used in an efficient manner, that will benefit those resources, you know, the owners of the resources, and will do so so that it does not waste. But that's done at the instance of an interested party. They'll come in front of the board. They'll say, we want this permanent spacing unit. And that's exactly what happened in the spring of 2014 when Continental filed its application for a permanent spacing unit and a pooling order, which was, of course, about six months late after the Continental lease had expired by its terms. Tell me, help me understand this area of the law, because I understand your position to be that the mere creation of a temporary spacing unit does not affect a pooling of interests, that you need something else besides. In addition to that, and I gather it's some kind of a voluntary agreement between the parties, or help me with that part of it. That is a potential circumstance. So the process we were talking about earlier with the commission and an application is solely for compulsory pooling. At any time, all the interest holders under a spacing unit could volunteer that they will split the proceeds of production amongst themselves in whatever manner that they see fit, and that would be a voluntary pooling unit. But that's not what we're dealing with here. What was required was a compulsory pooling unit, which requires a hearing before the commission and requires under 8211-202 a permanent spacing unit. Okay. And so you heard your opponent say that, you know, they read this as suggesting that the creation of the pooling of interest does not need to occur during the primary term of the lease. So why do you think that that's not the correct reading? Because I don't think it matches with Montana law. Hey, we're having to juxtapose both Montana law and this lease. And it's correct that this is essentially a form lease, and it's used across several different states. And that's why broad definitions aren't included in here. But as the court has already recognized, when it describes a unit that may pool interest, it actually says may be described as a spacing unit, which is permissive. And that's something that Continental has actually briefed in its reply brief with regard to the other requirements of a unit. And in the second sentence, which is also arguably permissive, it describes a pooling or a unit that would create pooling as merging one or more leases for the purpose of acting as a single entity. And really that's kind of the basic definition of a pool is merging multiple interests so that they can share in the production of the oil and gas that's produced from those lands. So I think that that definition matches with what Montana requires for a compulsory pooling order. And that would have to be done during the term of the lease, because otherwise the lease expires and there's never production, if that makes sense. In fact, even in this case, it's admitted that there was no production of oil until January of 2014. Now there's provisions in there that say that if you begin drilling operations before that applies, but the drilling operations were only completed on Section 3, which is not the lease premises. So to impute the drilling operations to the lease premises, which were not drilled on, you need the pooling. So the well is first drilled by Continental on Section 10E, is that correct? On the east half of it. 10 east. Yeah, the east half of Section 10, yes. Section 10, okay. And is that pooled with 10 west? So the eventual compulsory pooling unit or permanent spacing unit and pooling order pooled all of Section 10, which is actually a smaller, we have what is normally, excuse me, there's a 1280 spacing unit normally, two sections of 640. In this case, it combined all of Section 10 and all of Section 3, which only amounted to 878 acres, I believe, because of that curvature of the earth issue. It turns out that 10 west and 10 east are in fact pooled, that is, they're drawing from a common source? As of May 1, 2014. That's when the board issues its order? Correct. Okay. What Continental wants to do is to sort of force that to relate back by virtue of the lease. Yes. To be honest, I'm not entirely, so Continental is trying to use the later pooling order to hold its lease by production. It's not trying to use the provisions of the lease, I don't think, to, I guess, to pool earlier, if that makes sense. They're kind of separate issues. Well, as I understand the argument, Continental is primarily saying that the temporary spacing unit established the pooling.  Which preceded, of course, the drilling that they did on the adjacent land. It did. But as I already mentioned, that also didn't happen during the primary term of the lease. It was not done by either of the lessees or the lessors, or the single lessor. So we also believe that that would not be applicable under that clause. If the court would have no more questions of Northwest, I'd cede my time to Northern. Okay. Thank you. Thank you. Good morning, your honors. May it please the court, Nick Schwarzengerber on behalf of Northern Oil and Gas. And to be quite frank with you, I thought I'd be arguing about the second issue, which relates to the well proposal. And I just wanted to make a few additional comments on this pooling issue. The distinctions that need to be drawn here, I think, relate to well location rules. Which are sort of the default rules before there's any permanent spacing or pooling. Followed by permanent spacing when a well actually gets drilled. Followed by compulsory pooling. And you're absolutely correct that you can voluntarily or contractually pool without a permanent spacing unit. But that's not what happened here. Continental's right to voluntarily pool or pool by declaration is what we call it under 16A. Expired 30 days prior to the end of the primary term. And so they had to take the second approach, which is to compulsory pool. And that had to, by the plain language of the lease, occur during the primary term. And so when we say the primary term, it had to happen before September 28th or whatever it was, 2000. It happened by the terms of the primary lease. It had to happen during the lease term. What plain language are you referring to? It says it is understood and agreed that in the event during the primary term. Where are you reading? Oh, I'm sorry, 16B. Okay. 16B. Okay, I got it again. Okay. During the primary term, a portion or portions of land covered by this lease are pooled. Either in accordance with 16A and pool in the oil and gas industry. It's a very well-known term. It's basically the merging. It's defined actually in a sense in 3E when it talks about leases being merged together for purposes of operating as a single entity. And in the conventional oil and gas context, you have to, if you want to compulsory pool, you have to create a permanent spacing unit. Because that's the only way that operations on one tract within the unit can be imputed to the other tracts within the same unit. Right. Now, this is a kind of almost a grammatical, a syntactical point. You're reading this in the event during the primary term, a portion or portions are pooled. Well, that suggests that the pooling itself must take place. A permissible reading of this, it would seem to me, that it has been pooled and the pooling exists during the primary term of the lease. Why is that not a proper reading? I want to make sure I understand your question. Our position is that the pooling has to occur during the primary term. I understand. And I can see where that linguistically can come out of that phrase, but I'm not sure it has to come out of that phrase. That is to say, it seems to me a permissible reading of that is that during the term of the lease, it has been pooled. So, which means that if the pooling took place earlier, well, it's during the term of the lease. Right, and a temporary spacing unit just simply doesn't pool. That's a different argument, and you would win on that one, too. Correct. And that's our point, is that a temporary spacing unit is... Doesn't accomplish pooling. It's basically a well-location rule, essentially, that the board had to come in and create these temporary spacing units because of the uniqueness of this area. You had 238-acre sections on the northern end of the township, and so the default rules that are normally applied by rule couldn't apply here. And so 2003, for what we call Bakken three-forks development, those are the target formations, the board had to come in and establish these temporary spacing units so as to not strand these smaller sections on the very north end of the township. But that's simply a well-location rule. It just says where you can drill. The permanent spacing unit is more of an engineering concept. Once you drill, you kind of look at the area that's deemed to be drained by the well, and you match your spacing unit to that. And then pooling is a matter of what we call protecting the correlative rights of the owners within the spacing unit so that each owner within the unit is entitled to his just and equitable share. Just for this very instance, if the well is not drilled on my land but I'm in the unit, I can't go and do likewise because there's already an operator drilling wells in the unit. So I get to share in that production. And the pooling is the statutory mechanism to do that. Without pooling, there's no basis to impute production, to impute operations. So with that said, I don't think I have any further comments unless the Court has any questions on the second issue relating to the well proposals. That hasn't been discussed yet, so I don't really necessarily want to open the can of worms on that. Okay, thank you. Okay, thank you. Why don't we put two minutes on the clock, please, Ms. Morris. Your Honor, you hit precisely the issue I was trying to raise, which is you can read that contract language, the nonwithstanding, two ways. You can read it to require, as the District Court did, this is 16b, that the spacing unit had to be created during the primary term or it had to be pooling within the primary term. Or you can read it the other way, that there has to be pooling, doesn't matter when it happened, but that, right. I think that's permissible, although it's an unlikely reading. But if we go with that reading, you still have the problem of establishing that the temporary spacing unit established the pooling, which I don't think you can do. Okay, well, but therein lies the issue of do you have to look outside the contract and look to definitions or are you confined within the four corners of the contract? Because this contract clearly says pooling is accomplished by the creation of a spacing unit. And there's no question you It does not say that. Well. I mean, I read it a couple of times. You can read it to me again. Okay. In the event during the primary term a portion or portions of the land covered by this lease are pooled. Yeah. Either in accordance with 16a, which everyone agrees doesn't apply, or by creation of a unit as defined in paragraph 3E. Right. Right. And so if you read this contract to me, that happened. The creation of the spacing unit has happened. No. And 3E says nothing about it being temporary or permanent. And that's, I think the important thing that came out here was this is a No, you weren't listening, at least if you're trying to persuade me. You weren't listening to my reading of 3E. Okay. But 3E says, and I'm going to make sure I get it right so I'm not messing up by misquoting it, because 3E says units shall meet a bounded area formed for the purpose of producing oil and gas. Correct. That's what the unit is. Right. And it may be described by reference to spacing unit, drilling unit, and so on. But the spacing unit is not the agreement or document or action that creates the bounded area that is the unit. Okay. In other words, I don't think a temporary spacing unit is the creation of the bounded area. That's not what 3E says. Okay. Yes. Okay. And, again, I guess I just would come back to saying this contract is very confusingly written on that point. And we just heard counsel say it was a form lease used across three states. And so that being the case, I think my client's reading of the contract is reasonable. All's Montana law requires for there to be an ambiguity is is that you've made a reasonable reading of the contract. Then the question becomes for the court what who is it construed for or against. And in this case, it should have been construed against the drafter. Okay. Thank you very much. I think we learned something about oil and gas law. Whether we learned enough or learned it right, we'll find out. Thank both sides. Northern Gas versus Continental, to say it in an abbreviated form, now submitted. And that completes it for this morning. Thanks very much.
judges: W. Fletcher, Bybee, Watford